1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JARED TOMLINSON,                              No.  2:19-cv-817 JAM EFB P

12                     Petitioner,

13        v.                                       ORDER AND FINDINGS AND
                                                   RECOMMENDATIONS
14   DAVID BABBY,[1]

15                     Respondent.

16

17        Petitioner is a California parolee who, proceeding through counsel, brings an application

18   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He was charged and convicted in the

19   Butte County Superior Court of: (1) oral copulation of a person under sixteen (§288a, subd.

20   (b)(2)); (2) sodomy of a person under sixteen (§286, subd. (b)(2)); and (3) attempted sodomy of

21   person under sixteen (§§ 664/286, subd. (b)(2)).

22        His habeas petition raises three claims.  First, he claims he was deprived of due process

23   when the trial court admitted testimony to show propensity.  Second, he claims that the prosecutor

24   violated his due process rights by vouching for the credibility of an adverse witness.  Third, he

25   claims that the cumulative effect of the foregoing errors warrants habeas relief.

26

27        [1]Petitioner has also filed a motion to substitute respondent.  ECF No. 19.  That motion is
     granted and David Babby, Regional Parole Administrator of Adult Parole for the Northern
28   Region of California, is substituted as respondent.

                                                 1

For the reasons stated below, it is recommended that the petition be denied.

## FACTUAL BACKGROUND

The following summation of the facts is quoted from the state appellate court's decision on direct appeal.  The court has reviewed the record and finds the appellate court's decision to be consistent therewith.

*Prosecution case*

When Doe 1 was a 13-year-old eighth grader, he lived in a three-bedroom mobile home with his mother, R.D., his stepfather, his brother, and his aunt. Doe 1 had his own room, but often slept in the living room. The others in the home would close their doors at night.

In early 2003, defendant, a distant relative from the stepfather's side of the family, moved into the home. He remained there until 2005 or 2006, moving out when Doe 1 was a high school junior. While defendant was there, defendant was attending a police academy. He subsequently became a police officer.

Soon after moving in, defendant began fondling Doe 1's genitals two or three times a week while Doe 1 tried to sleep on the living room couch and others in the household were sleeping. Doe 1 would pretend to be asleep and would make no noise.

Defendant progressed to orally copulating Doe 1's penis, also at night two or three times a week. When Doe 1 was 13 or 14, he began performing oral sex on defendant.[2] Doe 1 acknowledged that he told law enforcement he was 15 or 16 when he began doing this.)

Defendant sometimes had Doe 1 use his penis to anally penetrate defendant. Doe 1 could not remember how often this happened or how old he was, except that he was under 18. When he did this, defendant would ejaculate on Doe 1's stomach, then clean it up with a bath towel.

On one occasion, when Doe 1 was 14 or 15, defendant tried to penetrate him anally, but Doe 1 pushed him off and started crying.

At some point Doe 1 became depressed and began defecating in his pants. He had no views on homosexuality at that time, and his family

---

[2] [**footnote 2 in original text**] Doe 1 gave facially contradictory testimony about when he stopped doing so. Originally he said it was when he was under 18, but later he admitted he had continued to engage in oral sex with defendant until he turned 22, and explained that when he gave his first answer he did not think he was being questioned about events in his adult life. Over objection, the prosecutor was allowed to make a record before the jury that she advised Doe 1 pretrial that she would not ask him about what he and defendant did after he turned 18. Defendant now contends the trial court's ruling allowing the prosecutor to make this record without testifying under oath was prejudicial error. (See pt. 2.0 of the Discussion, post.)

did not disapprove of it. He kept quiet about what was going on because defendant asked him not to tell anyone, he did not want anyone to know, and he did not want defendant to go to jail or be interrupted in his career path.

In 2010, Doe 1 married K.H. They moved to North Carolina early in 2011. The marriage ended in divorce in 2012.

In March 2011, Doe 1 revealed to K.H. in a text message that he had been molested when he was in middle school and high school. She said she would go to the authorities, but he tried to dissuade her, claiming that they had been receiving money from defendant and would no longer do so if she told.[3] Later, Doe 1 told K.H.'s mother about the molestation in a text message on Facebook. In a declaration K.H. filed in a California family law case, she incorporated Doe 1's text message to her.[4]

Doe 1's mother, R.D., testified that she invited defendant to move in with her family in 2003 after the woman he had been living with died. He was roughly 19 to 21 years old when he lived there. He moved out in 2005 or 2006, but frequently visited afterward; sometimes he would stay and take care of the house and the kids while she and her husband traveled for a week at a time. Her relationship with him was like mother and son, even after he moved out.

R.D. noticed that soon after defendant moved in, Doe 1 became more emotional and argumentative. Twice, when he was 13 or 14, she found underwear in which he had defecated hidden in his room; the defecation "seemed to have a film or a haze over it." This caused her to wonder whether "somebody was messing with him."[5] She reported it to her husband.

R.D. also noticed that defendant seemed "clingy" toward Doe 1, "hang[ing] on" him in a way that he did not do with R.D.'s younger son. Defendant often went into the bathroom when Doe 1 was showering, but not when R.D.'s younger son was showering.

Because a friend of R.D. who was living there had just had a baby, there were baby monitors in the home. R.D. tried two or three times to use them to see if she could catch defendant, but the attempts failed.

[3] [**footnote 3 in original text**] According to K.H., defendant gave Doe 1 a few hundred dollars from time to time for work on defendant's ranch when she and Doe 1 still lived in California, but had not done so since then.

[4] [**footnote 4 in original text**] This declaration was apparently filed in the course of seeking a domestic violence restraining order against Doe 1.

[5] [**footnote 5 in original text**] The trial court sustained defense counsel's objection to the question whether R.D. had any idea who the molester might be.

3

In 2007 or 2009, according to R.D., defendant named her the executor of his will and named her children the beneficiaries. She believed his estate would be worth millions because he had acquired a ranch. She did not expect to be paid for acting as executor. She had never been told she was not (or was no longer) the executor.[6]

According to R.D., she borrowed $3,000 in cash from defendant in 2011, then repaid the loan in kind by painting the inside of defendant's house. After that, she wrote defendant a couple of checks, believing that it was right to "do more than you are expected" to do when someone has done something for you. He had never said she still owed him on the loan.

In 2013, R.D. received information from K.H. about Doe 1's alleged molestation. R.D. then talked to Doe 1 about what K.H. had told her. After the discussion with Doe 1, R.D. cried because "he had just confirmed what had happened to him."

About two months later, R.D. called her best friend, S.M., who lived in Arkansas. R.D. was too upset at first to talk to anyone: She just wanted to kill defendant, as she admitted to S.M.

Late in March 2013, S.M. and her friend M.B. came to see R.D. They stayed in R.D.'s home.

R.D. texted defendant to try to set up a meeting where she could confront him. The meeting finally took place at her home, with S.M. and M.B. hiding in a bedroom to listen to the conversation.

Defendant came in and tried to hug R.D., but she said: "You don't get to do that anymore." Looking shocked, he sat down. She said: "I brought you into this house. I loved you like you were my son. You called me mom. You called my kids your brother, and then I find out you've been . . . fucking my son since he was 14." Defendant turned pale and started shaking. He said: "I am sorry." She said: "You've been fucking my son since he's 14, and all you can tell me is you are sorry?" He said: "Yes. I am sorry, mom." She told him he needed "to get his lawyer, and get his cop buddies and get his story straight, because this was not going to end here."

Shortly afterward, R.D. contacted law enforcement. She also took an active part in the investigation, contacting everyone she could think of who had ever gone to defendant's ranch. She doubted that the police would do anything.

Sheriff's Detective Jason Miller, a member of the unit handling child abuse and sexual assault cases, received the case in early April 2013 from officers who had spoken with R.D. After reading their report, he set up interviews with R.D., her husband, Doe 1's ex-wife K.H.,

---

[6] [**footnote 6 in original text**] Law enforcement officers found a note by defendant purporting to name R.D. as his executor, but no will.

4

and Doe 1. He became aware that K.H. might have relevant information after R.D. said she had found paperwork from Doe 1's divorce and a restraining order which bore on the topic.

When Detective Miller interviewed Doe 1, he was open and communicative at first. But as they got into the alleged sexual acts, he began "to shut off and close down." He slumped over, turned away, almost cried, and gave shorter and shorter answers.

Detective Miller contacted many other people in the course of the investigation. R.D. put him in touch with some, but she was not his only source of leads.

Detective Miller also interviewed defendant and members of his family. When he interviewed defendant, defendant was under arrest, and Miller advised him of his rights before questioning him. Defendant acknowledged that he understood his rights, then said that "this was all about money that he had lent to somebody, and the family was now upset with him, and that there was a lot of allegations being flown [sic] around."

A second individual, identified as John Doe 2 (hereafter Doe 2), testified that Doe 1's home was "like my second home growing up." He is two years younger than Doe 1 and had maintained a "[f]airly close relationship with him.

When Doe 2 was a high school freshman or sophomore, in 2006 or 2007, he met defendant at Doe 1's home.

Doe 2 once spent the night at Doe 1's home when the family was out of town during a holiday break. He and defendant were the only ones there. After defendant bought liquor, they went back to Doe 1's home and drank enough to be intoxicated. They ended up in R.D.'s bedroom watching movies. They also talked about sexuality; defendant told him he should be "open-minded" and was too young to know what he wanted.

After falling asleep, Doe 2 woke up to find defendant's hand on his "ass," with a finger underneath his clothing and "trying to be put in between my ass cheeks." Doe 2 left the bedroom and went to the living room to sleep on the couch.

Doe 2 did not talk about the incident afterward with defendant, but he talked about it with his brother less than a month later. He had also recently discussed it with Detective Miller.

Doe 2 admitted that he had told Detective Miller defendant only "rubbed [his] quad"; he did not mention defendant's hand going beneath his underwear onto his "butt," or defendant buying liquor and the two of them getting inebriated together. He had not revealed as much then because he did not know how seriously the case would be taken, and because he wanted to talk to Doe 1 and "make sure this is what he wanted to be brought to light."

5

Doe 2 was originally contacted about the case by R.D. and her husband about a year and a half before trial. R.D. asked him if he knew what had happened between Doe 1 and defendant, and if anything had happened to him. Neither R.D. nor her husband told him what to say or threatened him with any adverse consequence if he did not go to law enforcement.

*Defense case*

M.A., defendant's next door neighbor and longtime close friend, accompanied defendant when he drove to R.D.'s home for what turned out to be his confrontation with R.D. She waited outside as he went in. Ten or 15 minutes later, he came back out, seeming "very upset" and saying "him and [Doe 1] got outed."

D.R., a Facebook acquaintance of R.D., gave Detective Miller a copy of an e-mail from R.D. that apparently mentioned the sum of $5,000, which D.R. thought might be evidence of an unpaid debt to defendant.

D.K., who had known defendant for four or five years, testified that Detective Miller had contacted him about the case. D.K. told Miller that R.D. had been contacting him and trying to meet with him, but he did not have time then. He said he had text and Facebook messages from R.D. and asked if he should bring them in, but Miller told him it would not be necessary. R.D.'s messages did not say why she wanted to meet with him, and he did not know her well. He inferred that it had to do with defendant because she indicated that she was "done with him."

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

I.     Applicable Statutory Provisions

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S.

6

362, 412 (2000).  It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief."  *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003).  If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error.  *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons.  *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary.  *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  *Id.* at 785.

A.      "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent."  *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

B.      "Contrary To" Or "Unreasonable Application Of" Clearly Established Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact.  *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003).  The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief.  *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

1    A state court decision is "contrary to" clearly established federal law if the decision

2    "contradicts the governing law set forth in [the Supreme Court's] cases." *Id.* at 405.  This

3    includes use of the wrong legal rule or analytical framework.  "The addition, deletion, or

4    alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply

5    controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*,

6    283 F.3d 1040, 1051 n.5 (9th Cir. 2002).  *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia

7    Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[7]  because it

8    added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir.

9    2010) (California Supreme Court's *Batson*[8]  analysis "contrary to" federal law because it set a

10   higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533

11   F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[9]  violation was

12   contrary to U.S. Supreme Court holding that such error is structural).  A state court also acts

13   contrary to clearly established federal law when it reaches a different result from a Supreme Court

14   case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v.*

15   *Angelone*, 530 U.S. 156, 165-66 (2000) (plurality op'n).

16   A state court decision "unreasonably applies" federal law "if the state court identifies the

17   correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the

18   particular state prisoner's case." *Williams*, 529 U.S. at 407 08.  It is not enough that the state

19   court was incorrect in the view of the federal habeas court; the state court decision must be

20   objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003).  This does not mean,

21   however, that the § (d)(1) exception is limited to applications of federal law that "reasonable

22   jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's

23   overly restrictive interpretation of "unreasonable application" clause.  State court decisions can

24   be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when

25

26   [7] *Strickland v. Washington*, 466 U.S. 668 (1984).

27   [8] *Batson v. Kentucky*, 476 U.S. 79 (1986).

28   [9] *Faretta v. California*, 422 U.S. 806 (1975).

1   they fail to give appropriate consideration and weight to the full body of available evidence, and

2   when they proceed on the basis of factual error.  *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins,*

3   539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v.*

4   *McCollum*, 558 U.S. 30, 42 (2009).

5          The "unreasonable application" clause permits habeas relief based on the application of a

6   governing principle to a set of facts different from those of the case in which the principle was

7   announced.  *Lockyer*, 538 U.S. at 76.  AEDPA does not require a nearly identical fact pattern

8   before a legal rule must be applied.  *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).  Even a

9   general standard may be applied in an unreasonable manner.  *Id.*  In such cases, AEDPA

10  deference does not apply to the federal court's adjudication of the claim.  *Id.* at 948.

11         Review under § 2254(d) is limited to the record that was before the state court.  *Cullen v.*

12  *Pinholster*, 563 U.S. 170, 180-81 (2011).  The question at this stage is whether the state court

13  reasonably applied clearly established federal law to the facts before it.  *Id.*  In other words, the

14  focus of the § 2254(d) inquiry is "on what a state court knew and did."  *Id.* at 1399.

15         Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review

16  is confined to "the state court's actual reasoning" and "actual analysis."  *Frantz*, 533 F.3d at 738

17  (emphasis in original).  A different rule applies where the state court rejects claims summarily,

18  without a reasoned opinion.  In *Harrington*, *supra*, the Supreme Court held that when a state court

19  denies a claim on the merits but without a reasoned opinion, the federal habeas court must

20  determine what arguments or theories may have supported the state court's decision, and subject

21  those arguments or theories to § 2254(d) scrutiny.  *Harrington*, 562 U.S. at 101-102.

22                  C.      "Unreasonable Determination of The Facts"

23         Relief is also available under AEDPA where the state court predicated its adjudication of

24  a claim on an unreasonable factual determination.  Section 2254(d)(2).  The statute explicitly

25  limits this inquiry to the evidence that was before the state court.

26         Even factual determinations that are generally accorded heightened deference, such as

27  credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2).  For

28  example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief

1    where the Texas court had based its denial of a *Batson* claim on a factual finding that the

2    prosecutor's asserted race neutral reasons for striking African American jurors were true.

3    *Miller El*, 545 U.S. at 240.

4         An unreasonable determination of facts exists where, among other circumstances, the

5    state court made its findings according to a flawed process – for example, under an incorrect

6    legal standard, or where necessary findings were not made at all, or where the state court failed to

7    consider and weigh relevant evidence that was properly presented to it.  *See Taylor v. Maddox*,

8    366 F.3d 992, 999 1001 (9th Cir.), *cert. denied*, 543 U.S. 1038 (2004).  Moreover, if "a state

9    court makes evidentiary findings without holding a hearing and giving petitioner an opportunity

10   to present evidence, such findings clearly result in a 'unreasonable determination' of the facts"

11   within the meaning of § 2254(d)(2).  *Id.* at 1001; accord *Nunes v. Mueller*, 350 F.3d 1045, 1055

12   (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section

13   2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings

14   consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v.*

15   *Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper

16   determination" of facts because state courts "refused Killian an evidentiary hearing on the

17   matter"), *cert. denied*, 537 U.S. 1179 (2003).

18        A state court factual conclusion can also be substantively unreasonable where it is not

19   fairly supported by the evidence presented in the state proceeding.  *See, e.g., Wiggins*, 539 U.S.

20   at 528 (state court's "clear factual error" regarding contents of social service records constitutes

21   unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state

22    court's finding that the prosecutor's strike was not racially motivated was unreasonable in light

23   of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002)  (state

24   court unreasonably found that evidence of police entrapment was insufficient to require an

25   entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

26        II.     The Relationship Of § 2254(d) To Final Merits Adjudication

27        To prevail in federal habeas proceedings, a petitioner must establish the applicability of

28   one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional

1  invalidity of his custody under pre AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir.

2  2008) (en banc).  There is no single prescribed order in which these two inquiries must be

3  conducted. *Id.* at 736, 37.  The AEDPA does not require the federal habeas court to adopt any

4  one methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

5       In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap.

6  Accordingly, "[a] holding on habeas review that a state court error meets the ' 2254(d) standard

7  will often simultaneously constitute a holding that the [substantive standard for habeas relief] is

8  satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736.  In such cases,

9  relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062,

10  1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion

11  that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321

12  F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure

13  to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and

14  granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1)

15  unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at

16  capital sentencing, and granting penalty phase relief).

17       In other cases, a petitioner's entitlement to relief will turn on legal or factual questions

18  beyond the scope of the § 2254(d) analysis.   In such cases, the substantive claim(s) must be

19  separately evaluated under a de novo standard. *Frantz*, 533 F.3d at 737.  If the facts are in dispute

20  or the existence of constitutional error depends on facts outside the existing record, an evidentiary

21  hearing may be necessary. *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary

22  hearing after finding § 2254(d) satisfied).

23  <u>DISCUSSION</u>

24      I.    <u>Admission of Propensity Evidence</u>

25       Petitioner argues that the trial court erred in admitting evidence of uncharged sexual

26  misconduct as propensity evidence pursuant to California Evidence Code sections 1101 and 1108.

27  /////

28  /////

11

1            A.      State Court Decision

2        Petitioner raised this claim on direct appeal and the state appellate court rejected it in a

3    reasoned decision:

4           Defendant contends the trial court erred prejudicially by admitting
            the testimony of Doe 2 pursuant to sections 1101 and 1108. The court
5           did not err.

6           1.1 *Background*

7           The People moved in limine for the admission of "evidence of
            defendant['s] sexual conduct with other juveniles" as propensity
8           evidence (§ 1108) or as evidence of intent, common plan or scheme,
            and/or motive (§ 1101).

9
            After the prosecutor stated in limine that a proposed witness, who
10          might be referred to as "John Doe 2," would be subject to a section
            402 hearing, the trial court reserved ruling on the motion.
11
            At the section 402 hearing, Doe 2 testified that on the evening when
12          he slept over at Doe 1's home and defendant was there, he woke up
            to find defendant's hand on his "lower back" (or "rather very lower
13          back, if you will"). When the trial court said he did not need to use
            euphemisms, Doe 2 said: "His hand was basically on my ass."
14
            Doe 2 testified that he and defendant were alone in the home because
15          Doe 1's family was out of town and defendant was watching the
            place; they drank liquor bought by defendant, became intoxicated,
16          and watched a movie in R.D.'s bedroom before Doe 2 fell asleep. At
            some point defendant talked to Doe 2 about sexuality, saying he
17          should keep an open mind about "guys versus girls" and he was too
            young to know what he wanted. Then they "measured penises" to
18          compare their respective sizes.

19          Doe 2 described calls from R.D. and her husband and stated that
            when she asked him if anything had happened between him and
20          defendant, he told her what had happened. She asked if he wanted to
            testify, but he was unsure about that at the time; he wanted to talk to
21          Doe 1 first. Sometime after that, he got a call from Detective Miller.

22          Doe 2 did not tell anyone before now about the penis-measuring
            incident "[b]ecause it's embarrassing. It's weird." He told the
23          detective defendant's hand was on his leg, not on his "ass."

24          After hearing argument, the trial court ruled as follows:

25          "Court intends to admit the evidence. The court will find several
            similarities, including where the events . . . 'allegedly occurred.' [¶]
26          . . . [¶]

27          "I do think that a [section] 352 analysis is important, but anytime you
            have information that's going to come to the jury that is negative to
28          the defendant, it's prejudicial. It's the nature of the [P]eople's

                                          12

evidence. The question is, is it going to confuse the issues? Is it going to use undue time, undue prejudice, and will it mislead the jury?

"I just cannot find, in balancing everything, that's the case. I think it's relevant under both [sections] 1108 and 1101[, subdivision] (b), on the issues of motive and intent. I have some question about the measuring incident, as opposed to the hand on the rear end testimony. I am going to exclude that. That was new to you, first of all. The witness was quite honest that he had never said it before to anyone. I had admonished him to be open, and to use any words that he felt necessary, and that's when . . . he presented that. It would be unfair to the defendant to allow that to come before the jury at this time. It's just going to be the touching."

1.2 Analysis

Since the trial court admitted the evidence under both section 1108 and section 1101, we consider section 1108, the broader statute, first. Concluding that the evidence was properly admitted under section 1108, we do not consider its admissibility under section 1101.

Under section 1108, subdivision (a), evidence of prior uncharged sexual offenses is admissible to prove defendant's propensity to commit such offenses, without restriction other than that of section 352. (*People v. Falsetta* (1999) 21 Cal.4th 903, 915-920, 89 Cal. Rptr. 2d 847, 986 P.2d 182 (*Falsetta*).) Under section 352, the trial court "must consider such factors as [the] nature, relevance, and possible remoteness [of the uncharged act], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, at p. 917.)

Because the decision whether to admit evidence under sections 1108 and 352 is entrusted to the trial court's sound discretion, we will not disturb its ruling on appeal unless that ruling was arbitrary, capricious, or patently absurd. (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1097-1098, 117 Cal. Rptr. 3d 239.) Defendant fails to make that showing.

Here, as the trial court found, the uncharged act was similar to the charged offenses in several ways. In addition to their location, which the court expressly noted, the acts were similar in that the alleged victims were males in their early teens; in both the uncharged act and the earlier of the charged acts, defendant tried to take advantage of sleeping victims; and the acts were preceded by or associated with "grooming" behavior (defendant's "clingy" manner toward Doe 1 and intrusions into the bathroom when he was showering, compared to defendant's plying Doe 2 with liquor and his barely veiled invitation to consider homosexual acts). Furthermore, the uncharged act was close in time to the last of the charged acts. And the

uncharged act—attempting to penetrate Doe 2's anus with a foreign object—was strongly similar in its nature to attempted sodomy, the conduct charged as count 6.

Because of the similarities of the uncharged act to at least the earlier of the charged acts, the uncharged act evidence was highly relevant. Because the uncharged act was allegedly done on a single occasion and was less serious than at least some of the charged acts, its potential for misleading, distracting, or confusing the jury was minimal. Finally, the trial court exercised discretion under section 352 to render the uncharged conduct less inflammatory by excluding the "penis-measuring" incident, which had no counterpart in the charged acts. (So far as defendant claims the court did not perform a section 352 analysis, this aspect of the ruling proves otherwise.)

Defendant asserts that the uncharged act was "not at all similar" to any of the charged acts because (1) the uncharged act, according to the prosecutor, would have constituted a misdemeanor, while the charged acts were felonies, and (2) the uncharged act was not similar in "kind" or "character" to the charged acts. We are not persuaded.

As to the first point, even assuming the prosecutor's assessment was correct, defendant cites no authority holding that uncharged acts must be potentially chargeable at the same level as charged acts to be sufficiently similar for purposes of sections 1108 and 352. We do not consider legal propositions unsupported by authority. (*People v. Stanley* (1995) 10 Cal.4th 764, 793, 42 Cal. Rptr. 2d 543, 897 P.2d 481.)

As to the second point, defendant relies on cases involving grossly dissimilar acts erroneously admitted under section 1108. (*People v. Earle* (2009) 172 Cal.App.4th 372, 379, 396-399, 91 Cal. Rptr. 3d 261 [weak sexual assault case consolidated with strong indecent exposure case]; *People v. Harris* (1998) 60 Cal.App.4th 727, 736-741, 70 Cal. Rptr. 2d 689 [23-year-old violent sexual assaults admitted in indecent exposure case].) In light of the similarities between the alleged act against Doe 2 and the charged acts against Doe 1, these decisions are inapposite.

Defendant asserts that the uncharged act evidence was prejudicial because it did not result in a conviction. (Cf. *Falsetta*, *supra*, 21 Cal.4th at p. 917 [evidence's "prejudicial impact . . . is reduced" if it resulted in actual conviction, because jury will not be tempted to punish defendant for uncharged acts].) It is true that *Falsetta* and other decisions have said that uncharged acts evidence is more likely to be prejudicial if it did not lead to a conviction. (We note, however, that the analysis could just as well cut the other way: If jurors learn that uncharged acts did not lead to a conviction, they might conclude the evidence was too weak to rely on.) But these decisions do not hold that evidence with any tendency to be prejudicial is inadmissible under sections 1108 and 352. All evidence adverse to the defendant is "prejudicial" in a sense, but that does not make it unduly prejudicial under section 352: It is so only if it """"tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues.'"" (*People v. Barnett* (1998) 17 Cal.4th

14

1044, 1118-1119, 74 Cal. Rptr. 2d 121, 954 P.2d 384.) Because the uncharged act evidence here was highly relevant to the issues, it was not prejudicial in that sense.

Defendant asserts that Doe 2's testimony was unreliable because he "repeatedly embellished" it. That point goes to the evidence's weight, not its admissibility. The trial court is not required to assess the credibility of uncharged acts evidence before deciding whether to admit it under sections 1108 and 352.

Defendant also asserts that Doe 2's testimony was not reliable for purposes of section 352 because it was not "independent of the evidence" of the charged offense: According to defendant, Doe 2 "gave testimony at the urging of" R.D. (Cf. *People v. Ewoldt* (1994) 7 Cal.4th 380, 404, 27 Cal. Rptr. 2d 646, 867 P.2d 757.) Defendant fails to support this assertion with citation to the record, which would entitle us to disregard it. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, 126 Cal. Rptr. 2d 178 & fn. 16 [factual claims must be supported by record citation wherever asserted in a brief].) In any event, it misleads by omission: Although R.D. contacted Doe 2 about the matter, he testified that he made up his own mind about whether to testify after talking to Doe 1 and Detective Miller. Lastly, Ewoldt does not hold that evidence whose source is not "independent of the evidence of the charged offense" is inadmissible under section 352: It merely states in dictum that such independence increases the reliability of evidence. (*Ewoldt*, *supra*, 7 Cal.4th at pp. 404-405 [noting that this factor is "of limited significance in the present case"].)

Because defendant has failed to show that the trial court abused its discretion by admitting Doe 2's testimony under section 1108, we need not decide whether it was also properly admitted under section 1101.

ECF No. 8-1 at 7-10.  Petitioner raised this claim again in a petition for review to the California Supreme Court (ECF No. 9-11 at 9) which was summarily denied (ECF No. 9-12).

B.     Legal Standards

The Supreme Court has long held that the federal habeas writ is unavailable to petitioners alleging only errors in the interpretation or application of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  And the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

C.     Analysis

This court is not empowered to review the correctness of state court decisions interpreting state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("a state court's

15

1   interpretation of state law ... binds a federal court sitting in habeas corpus"). And the Supreme

2   Court has never held that admission of propensity evidence violates a petitioner's due process

3   rights.[10] *See Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006); *accord Mejia v. Garcia*,

4   534 F.3d 1036, 1046 (9th Cir. 2008) ("Mejia can point to no Supreme Court precedent

5   establishing that admission of propensity evidence, as here, to lend credibility to a sex victim's

6   allegations, and thus indisputably relevant to the crimes charged, is unconstitutional."). Thus,

7   under AEDPA, federal habeas relief is foreclosed.

8       II.    <u>Prosecutorial Misconduct</u>

9       Next, petitioner argues that the trial court erred in allowing the prosecutor to act as an

10   unsworn witness in order to rehabilitate the credibility of Doe 1.

11       A.    <u>State Court Decision</u>

12       Petitioner raised this claim on direct appeal and the state appellate court rejected it in a

13   reasoned decision:

> Defendant contends the trial court erred prejudicially by "allowing the prosecutor to make herself an unsworn witness to rehabilitate the credibility of [Doe 1]." We conclude defendant has not shown error, but if there was any error it was harmless.
>
> 2.1 *Background*
>
> As recounted above, Doe 1 testified on direct examination that he had last engaged in oral sex with defendant when under age 18. On cross-examination, however, he admitted that he had done so as late as age 22.
>
> On redirect, the following colloquy occurred:
>
> "[PROSECUTOR]: Earlier today on direct examination, I asked you how old you were the last time you engaged in an act of oral copulation with the defendant, and whether you were under 18. And you said, 'yes.' Is that accurate?
>
> "[DOE 1]: No, ma'am.
>
> "[PROSECUTOR]: Why did you say—why is it not accurate?

---

[10] It explicitly held this question open in *Estelle*. 502 U.S. at 75 n. 5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").

16

"[DOE 1]: I was under the influence [sic] we were only speaking about the criminal matters in this case, not my adult life.

"[PROSECUTOR]: Did you engage in sexual acts with the defendant after you turned 18?

"[DOE 1]: Yes, ma'am.

"[PROSECUTOR]: How long did you continue to engage in sexual acts with the defendant after you turned 18?

"[DOE 1]: Until I was 22.

"[PROSECUTOR]: Why did you choose to engage in sexual acts with the defendant after you became an adult?

"[DOE 1]: Because it had happened since I was 13. It was just a normal part of my life at that point.

"[PROSECUTOR]: Who was the initiator in terms of sexual contact between the two of you after you became an adult?

"[DOE 1]: It would go both ways.

"[PROSECUTOR]: Did your relationship—you said until you were 22, the relationship went on?

"[DOE 1]: Yes, ma'am.

"[PROSECUTOR]: How did that relationship end?

"[DOE 1]: I stopped talking to [defendant]. My mother found out, and kind of called him out that he had been molesting me since I was 13, and he disappeared."

On re-cross, defense counsel asked Doe 1 whether he had gone over his testimony in the last two hours with the prosecutor. Doe 1 said he had. Counsel asked: "Did you discuss an explanation as to why you hadn't told the truth about the last oral sex act being after the age of 18?" Doe 1 said: "Yes, sir." Counsel continued: "And you've told us now that it was because you were having a relationship, a consensual relationship with my client, correct?" Doe 1 again said: "Yes, sir."

Later, the prosecutor asked:

"[PROSECUTOR]: You testified that you had met with me today, correct?

"[DOE 1]: Yes, ma'am.

"[PROSECUTOR]: And prior to today, did you understand or think that you were going to be asked questions by me regarding sexual acts that occurred between . . . you [and defendant] after you turned 18?"

17

Defense counsel objected. The trial court replied: "You raised the issue." Counsel said: "Then I get to follow. Thank you."

The prosecutor attempted to follow up: "And when we met previous to that, did I tell you that we were not going to be talking about—" Defense counsel objected, adding: "*If the DA wants to make herself a witness in the case, then we can continue on this line. She's pretty much offering that position*." (Italics added.)   The trial court overruled the objection, stating: "The basis of overruling the objection is you asked the question of the witness whether the district attorney had certain discussions." Counsel said: "And I have no problem with that. *But another Deputy DA should come in, ask the questions so that I can put her on the stand*." (Italics added.) The court replied: "That's not going to happen. The objection is overruled."

The prosecutor then asked Doe 1: "When we had a conversation previously, did I advise you that I would not be asking you any questions about sexual acts that occurred between you and the defendant after you had reached the age of 18?" Doe 1 answered: "Yes, ma'am."

Defense counsel subsequently asked Doe 1: "You were not surprised about questions that occurred after age 18 coming up in these proceedings, were you?" Doe 1 said: "No, sir." Counsel asked: "You had gone into great detail with what happened after 18 with Detective Miller, correct?" Doe 1 said: "Yes, sir." Counsel asked: "And Detective Miller had already questioned you as to your truth and veracity regarding your answers to what happened after age 18, correct?" Doe 1 said: "Yes, sir." Counsel asked: "So what you are telling us is that when you came here into the courtroom, you thought you could limit your testimony to only what happened—up until your allegations as to what happened up until age 18, but you didn't have to go into anything after that?" Doe 1 said: "It's what I was told."

*2.2 Analysis*

Defendant asserts that the trial court's ruling was error because it improperly allowed the prosecutor to vouch for Doe 1's credibility by acting as an unsworn witness. However, he cites no supporting authority on point. He relies mainly on case law involving prosecutors who actually testified or proposed to do so (the very thing he sought to force the prosecutor to do at trial). (*People v. Snow* (2003) 30 Cal.4th 43, 85-86, 132 Cal. Rptr. 2d 271, 65 P.3d 749 [possibility that prosecutors from a large district attorney's office might testify does not require recusal of the entire office]; *People v. Donaldson* (2001) 93 Cal.App.4th 916, 922-926, 113 Cal. Rptr. 2d 548; *People v. Guerrero* (1975) 47 Cal.App.3d 441, 443-444, 120 Cal. Rptr. 732.)

Defendant also asserts generally that improper vouching for a witness's credibility by a prosecutor may be prejudicial because the jury is likely to be unduly influenced by the prosecutor's presumed credibility. While we do not disagree with this abstract proposition, we do not understand how the prosecutor is supposed to have

vouched for Doe 1's credibility here. Once it became clear that Doe 1 had given a literally false answer to an important question, the jury needed to learn whether that false testimony could have an innocent explanation. The questions of both counsel allowed that issue to be thoroughly explored. The prosecutor never stated that she personally believed Doe 1 to be credible on this subject, and if the trial court had allowed defense counsel to put the prosecutor on the stand and testify under oath about it, that would have run a greater risk of improper vouching than what actually happened.

But even assuming the trial court erred by not allowing defendant to force the prosecutor to testify under oath, defendant fails to show any possible prejudice from what occurred. Contrary to his assertion, the case did not "turn[] on the credibility of [Doe 1]."

Although, as is typical in molestation cases, there was no direct evidence corroborating Doe 1's account of what passed between himself and defendant with no witnesses present, there was abundant circumstantial evidence that corroborated his account. Not only did Doe 2 tell a story that showed defendant's propensity for molestation, but R.D., K.H., and Detective Miller testified persuasively as to what Doe 1 told them. Above all, when R.D. directly accused defendant, he did not deny the charge. He said only "I am sorry"—a classic adoptive admission.

Although we are not persuaded that the trial court erred by overruling trial counsel's objection to the prosecutor's line of questioning, we are convinced that any error was harmless under any standard.

ECF No. 8-1 at 10-13.  Petitioner raised this claim again in a petition for review to the California Supreme Court (ECF No. 9-11 at 17) which was summarily denied (ECF No. 9-12).

### B.   Legal Standards

A petitioner raising a prosecutorial misconduct claim is entitled to federal habeas relief only if the alleged misconduct violated due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43 (1974).  In assessing prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly*, 416 U.S. at 643) (internal quotation marks omitted).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

/////

/////

19

C.     Analysis

Petitioner has failed to show that the prosecutor's alleged vouching was so prejudicial as to deny him due process.  There was substantial evidence of petitioner's guilt and the case did not, as the state appellate court pointed out, hinge on Doe 1's credibility.  Doe 2 offered evidence of petitioner's propensity for molestation.  ECF No. 9-5 at 173-79.  Other witnesses testified that Doe 1 had told them about petitioner's molestation.  ECF No. 9-4 at 178; ECF No. 9-5 at 83-86, 193-96.  One witness – R.D. testified that she had accused petitioner of molesting Doe 1 and he did not deny her charge.  ECF No. 9-5 at 94-95.  Instead, he said only "I am sorry." *Id.* at 95.

Additionally, the trial court instructed the jury that it was not to consider anything counsel said to be evidence.  ECF No. 9-2 at 8.  The instructions specifically stated:

> Nothing that the attorneys say is evidence.  In their opening and closing arguments, the attorneys will discuss the case, but their remarks are not evidence.  Their questions are not evidence.  Only the witness's answers are evidence.  The attorneys' questions are significant only if they help you understand the witnesses' answers.  Do not assume that something is true just because one the attorneys asks a question that suggests it is true.

*Id.*  Absent evidence to the contrary – which petitioner has not provided – the court presumes that the jury complied with its instructions.  *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

For the foregoing reasons, this claim should be denied.

III.     Cumulative Error

Finally, petitioner argues that the cumulative effect of the foregoing, alleged errors violated his due process rights.

A.     State Court Decision

The state court rejected this argument:

> Defendant contends the cumulative effect of the errors violated his right to due process. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32, 49 Cal. Rptr. 2d 413, 909 P.2d 1017.) Here, we have found defendant was not prejudiced by the trial court's admission of uncharged acts evidence, and the prosecution did not present unsworn testimony or improperly vouch for the victim's credibility. Accordingly, there was no cumulative error.

/////

1    ECF No. 8-1 at 13.  Petitioner raised this claim again in a petition for review to the California

2    Supreme Court (ECF No. 9-11 at 19) which was summarily denied (ECF No. 9-12).

3                    B.       Legal Standards

4            "The Supreme Court has clearly established that the combined effect of multiple trial

5    court errors violates due process where it renders the resulting trial fundamentally unfair." *Parle*

6    *v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298

7    (1973)).  "Cumulative error applies where, although no single trial error examined in isolation is

8    sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still

9    prejudiced a defendant." *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting

10   *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)) (quotation marks omitted).

11                   C.       Analysis

12           Here, the court found that there was no error with respect to the admission of propensity

13   evidence.  Thus, even if the trial court erred in allowing the prosecutor to act as an unsworn

14   witness, petitioner would not be entitled to relief based on cumulative error.  *See United States v.*

15   *Solorio*, 669 F.3d 943, 956 (9th Cir. 2012) ("There can be no cumulative error when a defendant

16   fails to identify more than one error."); *United States v. Allen*, 269 F.3d 842, 847 (7th Cir.

17   2001)("if there are no errors or a single error, there can be no cumulative error").  This claim

18   must also be denied.

19                                    CONCLUSION

20           Accordingly, it is ORDERED that:

21           1.  Petitioner's motion to substitute respondent (ECF No. 19) is GRANTED; and

22           2.  David Babby, Regional Parole Administrator of Adult Parole for the Northern Region

23               of California, is substituted as respondent.

24           Further, it is RECOMMENDED, for all the reasons explained above, that the petition for

25           writ of habeas corpus be denied.

26           These findings and recommendations are submitted to the United States District Judge

27   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

28   after being served with these findings and recommendations, any party may file written

                                                21

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  April 29, 2020.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE